NO. COA14-43

NORTH CAROLINA COURT OF APPEALS

Filed: 5 August 2014

DANIEL JOSEPH TRUHAN,
    Plaintiff-Appellee,

    v.                                          Wayne County
                                               No. 12-CVS-450

SUSAN P. WALSTON and
DAVID M. WALSTON,
    Defendants and Third-Party
    Plaintiff-Appellant Susan P.
    Walston,

    v.

NORTH CAROLINA FARM BUREAU
MUTUAL INSURANCE COMPANY,
UNITED SERVICES AUTOMOBILE
ASSOCIATION, and WESTERN
SURETY COMPANY,
    Third-Party Defendants.


Appeal by Defendant and Third-Party Plaintiff Susan P. Walston from orders entered 7 October 2013 and 4 November 2013 by Judge Kendra D. Hill in Superior Court, Wayne County. Heard in the Court of Appeals 6 May 2014.

*Teague, Campbell, Dennis & Gorham, L.L.P., by Bryan T. Simpson and Natalia K. Isenberg, for Daniel Joseph Truhan, Plaintiff-Appellee and Western Surety Company, Third-Party Defendant-Appellee.*

*Poyner Spruill LLP, by Timothy W. Wilson, for North Carolina Farm Bureau Mutual Insurance Company, Third-Party Defendant-Appellee.*

*Battle, Winslow, Scott & Wiley, P.A., by M. Greg Crumpler, for United Services Automobile Association, Third-Party Defendant-Appellee.*

*Whitley Law Firm, by Ann C. Ochsner, for Susan P. Walston, Defendant and Third-Party Plaintiff-Appellant.*

McGEE, Judge.

We review an order from the trial court that (1) granted summary judgment in favor of Daniel Joseph Truhan ("Plaintiff"), Western Surety Company ("Western Surety"), North Carolina Farm Bureau Mutual Insurance Company ("Farm Bureau"), and United Services Automobile Association ("United Services") (collectively, "Third-Party Defendants"); (2) dismissed all counterclaims, and third-party claims of Defendant Susan P. Walston ("Defendant"); and (3) denied the motion for summary judgment filed by Defendant, Defendant David M. Walston, and unnamed Defendant Argonaut Great Central Insurance Company ("Argonaut"). Therefore, the following recitation of the "facts" presents the evidence that was before the trial court in the light most favorable to Defendant and ignores evidence favorable to Plaintiff. *Peter v. Vullo*, __ N.C. App. __, __, 758 S.E.2d 431, 434 (2014) (for summary judgment "the evidence presented by the parties must be viewed in the light most favorable to the non-movant") (citations omitted).

The following is the evidence taken in the light most favorable to Defendant. The North Carolina Highway Patrol ("Highway Patrol") received a call from Kaye Howell ("Ms. Howell"), a witness to a two-vehicle accident, at approximately 7:08 a.m. on 30 December 2009. Ms. Howell then called Wayne County Communications to report the accident, and to inform them that no emergency services were needed because there had been no injuries. The Highway Patrol also called Wayne County Communications to report the accident and also informed them that there were no injuries. However, the Highway Patrol did inform Wayne County Communications that the accident was on a curve in the road and a trooper could not get to the scene right away; therefore, traffic control was needed. Ms. Howell called Wayne County Communications again to inform them that a woman who was involved in the accident was arguing with a man she apparently knew, who had arrived at the scene, and that the woman had pushed the man. Ms. Howell asked for the estimated time of arrival of the dispatched deputy, because the woman was "getting a little bit out of hand." However, Joshua Carroll, who was also involved in the accident, stated: "At no time while I was present at the scene of the collision did I observe any physical violence by anyone."

Plaintiff was a deputy for the Wayne County Sheriff's Office. He was leaving a Kangaroo Express located at Highway 117 and Carolina Commerce Drive in Goldsboro on 30 December 2009. Plaintiff overheard the call from the Highway Patrol to Wayne County Communications requesting that a Wayne County deputy respond to the accident and provide traffic control. Plaintiff indicated to Wayne County Communications that he was free, closer to the accident, and could respond. Plaintiff received the okay to respond to the accident at approximately 7:19 a.m. About one minute later, Wayne County Communications began receiving calls of a second accident involving injuries at Highway 117 North and Woodview Drive, approximately one and one-half miles from the Kangaroo Express. This second accident involved Plaintiff and Defendant.

At the time of the accidents, Plaintiff had been working as a deputy for just under three years. Plaintiff was a warrant officer and spent his days serving warrants. Plaintiff only responded to calls when no patrol deputy was available, or there was some other circumstance that warranted departure from Plaintiff's usual duties. Before becoming a deputy, Plaintiff had worked briefly for the Goldsboro Police Department as a school resource officer. Plaintiff explained his "skill, ability, and training" for high speed driving as follows:

> I know my limitations of driving. I know when I'm on the limits of traction or handling a vehicle. Everybody – you know if you're going into a curve whether you're going too fast. You can – it's a perception thing. It's not something I can quantify to you. At no time during that time did I feel that I had exceeded my ability to control that vehicle.

Plaintiff had received no training for emergency driving beyond the Basic Law Enforcement Training certification curriculum he had taken at Wayne Community College in 2004.

Wayne County Sheriff's Office policy recognizes three kinds of police driving:

> <u>Emergency Response Driving</u>: is driving to the scene of a call where there may be a danger to life, or a threat to officer safety, or reported violence or threat of imminent violence.
>
> <u>Pursuit Driving</u>: is the attempt to apprehend a person subject to arrest who is fleeing in a vehicle, and includes "catch up" driving for traffic enforcement purposes before a violator attempts to flee.
>
> <u>Routine driving</u>: is all on-duty driving other than "emergency response driving" [or] "pursuit driving" and includes routine patrol, service of warrants, transportation of prisoners, going to location of non-emergency calls, or other driving in performance of duty.

POLICY TITLE: Emergency Response & Vehicle Pursuits, Wayne County Sheriff's Office General Order (Revised January 7, 2002).

According to the evidence most favorable to Defendant, in the approximately one to two minutes between the time Plaintiff received the call regarding the first accident and the time Plaintiff and Defendant were involved in the second accident, the following occurred. Plaintiff headed north on Highway 117, passed an exit that connected with Interstate 95, passed a school, and passed a fire station before he reached the intersection of Highway 117 and Woodview Drive. The fire station was about three tenths of a mile south of Woodview Drive. At some point before his collision with Defendant, Plaintiff activated his blue lights, but he did not activate his siren. Trooper L. J. Bunn ("Trooper Bunn") of the Highway Patrol, who investigated the accident, believed the speed limit along part of that section of the road was thirty-five miles per hour ("mph").

According to a collision analysis report produced by Collision Analyst William J. Kluge, Jr., along that mile-and-a-half section of road, Plaintiff reached speeds over one hundred mph, passed automobiles traveling both north and south, and had his accelerator fully depressed at times. The speed limit at the site of the accident was forty-five mph. Four and one-half to five seconds before the collision, Plaintiff was traveling eighty-six to eighty-seven mph, and was accelerating. Plaintiff was maintaining full throttle acceleration "for at least a couple

of seconds when [Defendant's truck] would have come into view[,]" and maintained full throttle acceleration until approximately one-half second before the impact, at which time Plaintiff removed his foot from the accelerator and began to depress the brake. Plaintiff was traveling approximately ninety-five mph at the time of impact. Plaintiff "should have been on alert and noticed [Defendant's truck] before [Defendant] began to make her turn and [should have] adjusted his speed accordingly."

Continuing with evidence presented in the light most favorable to Defendant, Defendant left her house on Woodview Drive, a residential street, shortly after 7:00 a.m. on 30 December 2009. As Defendant approached the intersection of Woodview Drive and Highway 117, she slowed down, and came to a complete stop at the stop sign. Defendant pulled forward to obtain a better view up and down Highway 117, and again stopped. Defendant looked to the left, looked to the right, looked back to the left, and then pulled onto Highway 117, initiating a left-hand turn onto Highway 117 South. Before Defendant pulled onto Highway 117, she did not see any vehicles coming from the left, but did see a truck coming from the right, which turned into a drive, then Defendant looked to the left again and saw no vehicles. As Defendant "made [her] effort to leave the stop sign, there was nobody to the left." As Defendant was entering

the southbound lane of Highway 117, she saw blue lights out of the corner of her eye and was immediately hit by Plaintiff's cruiser.

Both Plaintiff and Defendant were seriously injured in the accident. Plaintiff filed his complaint on 29 February 2012, alleging that Defendant was negligent, and that Defendant's negligence caused the accident and Plaintiff's injuries. Plaintiff also brought suit against Defendant's husband, David M. Walston, pursuant to "the Family Purpose Doctrine." Defendant answered and counterclaimed on 23 May 2012. Defendant denied that any negligence on her part caused the accident, alleged that Plaintiff's negligence was responsible for her injuries, and requested both compensatory and punitive damages. Defendant filed a "Motion for Leave to Amend Counterclaim and File Third Party Complaint" against Farm Bureau, United Services, and Western Surety, Third-Party Defendants, on 14 December 2012. Defendant's motion was granted by order filed 21 December 2012.

Plaintiff answered Defendant's amended counterclaim and third-party complaint on 31 Jan 2013, and pleaded the affirmative defenses of governmental immunity and contributory negligence. Plaintiff and Western Surety moved for summary judgment against Defendant on 20 June 2013, arguing that Defendant's counterclaims should fail as a matter of law. Farm Bureau filed a motion for

summary judgment on 25 June 2013, and United Services filed a motion for summary judgment on 9 July 2013. Defendant, along with David M. Walston and Argonaut, filed a motion for summary judgment on 8 August 2013. The trial court, in an order entered 7 October 2013, granted summary judgment in favor of Plaintiff, Western Surety, Farm Bureau, and United Services "as to all claims, counterclaims and/or third-party claims asserted against them by Defendant[.]"

In that same order, the trial court denied the motion for summary judgment filed by Defendant, David M. Walston, and Argonaut. On 4 October 2013, Defendant filed a Motion for Reconsideration of the grant of summary judgment in favor of Plaintiff, Western Surety, Farm Bureau, and United Services or, in the Alternative, for Certification of Order as a Final Judgment. By order entered 4 November 2013, the trial court denied Defendant's motion for reconsideration, but granted Defendant's motion for certification pursuant to Rule 54(b), whereby the trial court certified as a final judgment the order granting summary judgment in favor of Plaintiff, Western Surety, Farm Bureau, and United Services. Defendant appeals.

## I.

> "Our standard of review of an appeal from summary judgment is *de novo*; such judgment is appropriate only when the record shows that there is no genuine issue as to any material

> fact and that any party is entitled to a judgment as a matter of law."

> > The moving party bears the burden of establishing the lack of a triable issue of fact. If the movant meets its burden, the nonmovant is then required to produce a forecast of evidence demonstrating that the [nonmoving party] will be able to make out at least a *prima facie* case at trial. Furthermore, the evidence presented by the parties must be viewed in the light most favorable to the non-movant.

*Peter*, __ N.C. App. at __, 758 S.E.2d at 434 (citations omitted). "'[I]ssues of negligence are generally not appropriately decided by way of summary judgment, [unless] there are no genuine issues of material fact, and an essential element of a negligence claim cannot be established[.]'" *Greene v. City of Greenville*, __ N.C. App. __, __, 736 S.E.2d 833, 835, *disc. review denied*, __ N.C. __, 747 S.E.2d 249 (2013).

## II.

In Defendant's first argument, she contends the trial court erred in granting summary judgment in favor of Plaintiff because her "forecast of the evidence establishes a genuine issue of material fact regarding [Plaintiff's] gross negligence." We agree.

Defendant argues that N.C. Gen. Stat. § 20-145, which allows police officers to exceed the posted speed limit in certain

situations, applied to Plaintiff on the morning of the accident, but that, because Plaintiff's conduct rose to the level of gross negligence, Defendant should recover in negligence from Plaintiff. N.C. Gen. Stat. § 20-145 states:

> The speed limitations set forth in this Article shall not apply to vehicles when operated with due regard for safety under the direction of the police in the chase or apprehension of violators of the law or of persons charged with or suspected of any such violation, nor to fire department or fire patrol vehicles when traveling in response to a fire alarm, nor to public or private ambulances and rescue squad emergency service vehicles when traveling in emergencies, nor to vehicles operated by county fire marshals and civil preparedness coordinators when traveling in the performances of their duties. *This exemption shall not, however, protect the driver of any such vehicle from the consequence of a reckless disregard of the safety of others.*

N.C. Gen. Stat. § 20-145 (2011) (emphasis added).[1] This Court has discussed relevant factors in the N.C. Gen. Stat. § 20—145 analysis as pertains to pursuit as follows:

> N.C. Gen. Stat. § 20-145 exempts police officers from speed laws when pursuing a law violator. However, the exemption "does not apply to protect the officer from the consequence of a reckless disregard of the safety of others." Our Supreme Court has held that "an officer's liability in a civil action for injuries resulting from the officer's vehicular pursuit of a law violator is to be determined pursuant to a gross

---

[1] N.C. Gen. Stat. § 20-145 was amended effective 1 October 2013. We cite to the version in effect at the time of the collision.

negligence standard of care." Grossly negligent behavior is defined as "wanton conduct done with conscious or reckless disregard for the rights and safety of others." . . . .

When determining whether an officer's actions constitute gross negligence, we consider: (1) the reason for the pursuit, (2) the probability of injury to the public due to the officer's decision to begin and maintain pursuit, and (3) the officer's conduct during the pursuit.

Relevant considerations under the first prong include whether the officer "was attempting to apprehend someone suspected of violating the law" and whether the suspect could be apprehended by means other than high speed chase. . . . .

When assessing prong two, we look to the (1) time and location of the pursuit, (2) the population of the area, (3) the terrain for the chase, (4) traffic conditions, (5) the speed limit, (6) weather conditions, and (7) the length and duration of the pursuit.

. . . .

Under the third prong we look to [the officer's] conduct during the pursuit. Relevant factors include (1) whether an officer made use of the lights or siren, (2) whether the pursuit resulted in a collision, (3) whether an officer maintained control of the cruiser, (4) whether an officer followed department policies for pursuits, and (5) the speed of the pursuit.

*Greene*, __ N.C. App. at __, 736 S.E.2d at 835-36 (citations omitted). We believe similar factors are useful in evaluating an

officer's conduct when "emergency response driving" to the scene of an incident, as well.

We note — absent knowledge that there is a reasonable risk of death, serious bodily injury, or some other grave threat — that the need for an officer to engage in emergency response driving is not as apparent as when engaging in a vehicle pursuit. A vehicle fleeing at high speed constitutes, by its very nature, a great risk of death or injury to multiple persons. When engaged in a pursuit, an officer often must drive at high speed to maintain contact with the fleeing vehicle. Of course, an officer must still engage in risk analysis and cease pursuit if the risk of harm to others becomes too great. *Id*. The justification for an emergency response to the scene of an incident may not be as immediately apparent.

We will view the three factors stated in *Greene* in the light most favorable to Defendant:

### A. The reason for the pursuit

Plaintiff was responding to a request for traffic control at the scene of a minor accident involving no injuries. Though a witness informed Wayne County Communications that a woman was arguing with a man and had pushed him, and though Plaintiff testified he was concerned there was a "violent" situation in the vicinity of a school, there is no evidence in the audio recording

from that morning that Plaintiff was ever informed of any disturbance. Therefore, we do not consider the disturbance in our summary judgment analysis, as it is for the trier of fact to resolve the issue of whether Plaintiff was aware of the disturbance prior to his collision with Defendant. However, even assuming *arguendo* Plaintiff was aware of the disturbance, there is no evidence that the disturbance was serious, or that anyone was in danger of being injured, much less seriously injured. Plaintiff admitted that he did not believe there was any officer safety issue involved. Investigating officer Lieutenant Carter Hicks ("Lieutenant Hicks"), of the Wayne County Sheriff's Office, testified that policy dictates, even in emergency response situations, that officers must "drive in due regards to the safety of others[;]" that this policy applies to all driving, not just pursuits, and that he considers "domestic violence calls[,] unless there's a life-threatening situation involved[,]" to be non-emergency response situations. Lieutenant Hicks testified that the situation involving Plaintiff required Plaintiff to "balance the need to pursue or apprehend a violator against the risk of damage to property or injury to persons." "Deputies . . . must always be aware that their first obligation is to protect the public." Policy dictated that Plaintiff had to evaluate the reason for the emergency response "and seriousness

of the suspected violation." Blair Tyndall ("Mr. Tyndall"), the Director of Emergency Medical Services and Safety for Wayne County, testified that Plaintiff, when deciding how fast to proceed to the accident site, should have weighed the fact that he was "responding to a motor vehicle accident that had already occurred." Mr. Tyndall "felt" like Plaintiff was not following "due regard there under [N.C. Gen. Stat. § 20-145] for safety to others." Mr. Tyndall also believed Plaintiff was in violation of Wayne County Emergency Response and Vehicle Pursuit Policy that stated: "Driving that is a wanton and reckless disregard for safety of others is illegal and never justified by any emergency, no matter how serious." Mr. Tyndall understood that emergency response driving could be justified when "driving to the scene where there may be a danger to life, or a threat to officer's safety, or reported violence or threat of imminent violence[,]" but he "was not aware that there was any of those occurring at the accident [Plaintiff] was responding to." In Mr. Tyndall's opinion, Plaintiff was "operating unsafely[.]"

B. The probability of injury to the public due to Plaintiff's decision to begin and maintain emergency response driving

(a) Time and location of the pursuit. Plaintiff began his high-speed response at approximately 7:19 in the morning, and

crashed a minute or two later. This was a time when people were generally heading to work, and children were heading to school. It is uncertain from the evidence presented whether school was in session at the time of the accident, but Plaintiff testified that he believed it was. Along that section of Highway 117 are located a school, an on/off ramp for a nearby interstate, a fire station, and multiple residential driveways and side streets. Although that section of Highway 117 was not heavily developed, Defendant was pulling out of a residential neighborhood onto Highway 117 when Plaintiff's vehicle impacted her vehicle.

(b) The population of the area. The area was not densely populated, but there was a mix of residential, commercial, and governmental buildings along the highway. Highway 117 also connects Goldsboro with Pikeville and other towns.

(c) The terrain for the chase. Highway 117 is mostly flat, but has some curves in the section on which Plaintiff was traveling on the morning of 30 December 2009. There was "a right-hand curve that ended about $2/10^{th}$ of a mile south of the intersection" of Highway 117 and Woodview Drive. A witness, who Plaintiff passed while driving north on Highway 117, stated there was a line of trees that prevented the witness from seeing Defendant's vehicle until Defendant's vehicle began to pull out onto Highway 117.

(d) Traffic conditions. There is no evidence suggesting heavy traffic on Highway 117 at the time of the accident, but there were a number of automobiles in the area. One witness stated that Plaintiff passed him as they were both traveling north on Highway 117. Another, heading south, passed Plaintiff, and then saw the collision in his rear-view mirror. Two other witnesses in separate vehicles were very near the scene of the accident when it happened, one of whom considered honking her horn to warn Defendant not to pull out, but worried that might cause more harm by making Defendant hesitate.

(e) The speed limit. The speed limit was forty-five mph. Trooper Bunn believed the speed limit was thirty-five mph just south of where the accident occurred. Plaintiff was traveling at speeds over one hundred mph, and was accelerating at a speed of approximately ninety-five mph immediately before the collision.

(f) Weather conditions. There is no evidence of adverse weather conditions; however, it was early morning in winter.

### C. Plaintiff's conduct during the pursuit

When considering the evidence in the light most favorable to Defendant, we have to assume that Plaintiff failed to activate his siren. Trooper Bunn testified that Plaintiff should have had his lights and siren on, and that it is a violation for any law enforcement vehicle to initiate emergency driving without

activating both. Trooper Bunn explained: "I mean, as far as traffic hazard; somebody pull out in front of you, they will know you're coming. If you got your blue lights on, they're not going to hear your siren – I mean, know you're coming until you're right there on them." Lieutenant Hicks testified that Plaintiff was required to notify Communications that he was initiating emergency response driving, but Plaintiff failed to notify and "identify that he [was] running an emergency response of some sort[.]" Plaintiff was traveling at speeds that prevented him from utilizing the "four-second path of travel rule," and the "industry standards for visual lead time." According to the Basic Law Enforcement Training Driver Training manual: "The four-second path of travel is the vehicle's immediate path of travel. When you consider a four-second path of travel, you have time to take an escape route, or you have sufficient stopping distance from any object that may appear in your path of travel." Further:

> A visual lead time of twelve (12) seconds in rural areas . . . provides officers with needed time to appropriately select an immediate path of travel. It also gives officers time to search the areas beside the road, adjust their speed, or to make lane changes well in advance of any problems."

Plaintiff "did not consider the residential homes along [Highway] 117 during his emergency response" and therefore "failed to

consider the number of intersections (public streets, residential driveways, etc.)." Plaintiff could not recall traffic conditions at the time of the accident, and was not monitoring his speed. Plaintiff was accelerating out of a curve at the time the accident occurred. "It is reasonable to believe that [Plaintiff] experienced tunnel vision." "The effectiveness of the eyes' central and peripheral visions is reduced and becomes more narrow and blurred as the vehicle's speed is increased." Plaintiff should have been able to see Defendant's vehicle as he approached, but he did not. Plaintiff should have been operating at a speed allowing him to brake or take evasive action to avoid the collision with Defendant's vehicle, but he was not. According to Collision Analyst Kluge, had Plaintiff been traveling at a speed at or below seventy-four mph, the collision would not have occurred. Trooper Bunn testified that he could not recall why he had not charged Plaintiff for not engaging his siren or for excessive speed, but he opined: "I think he could have been at a lower speed, I mean, going to an accident." "I'd say [Plaintiff should have been going] 55 or 60 at the most. I mean, it was a [property damage] wreck. It wasn't no life-and-death situation there." In his Safety Director's Report, Mr. Tyndall stated that Plaintiff was "in violation of the sheriff's department standing policy for vehicle use and response. This is

also [Plaintiff's] second incident in 2009 with a motor vehicle collision. Recommend appropriate disciplinary action and remedial law enforcement drivers training." Mr. Tyndall believed Plaintiff was not operating his vehicle with "due regard for safety" and was exhibiting "a wanton and reckless disregard for safety of others[.]"

This Court addressed a similar situation in *Jones v. City of Durham*, 168 N.C. App. 433, 608 S.E.2d 387 ("*Jones I*"), *aff'd*, 360 N.C. 81, 622 S.E.2d 596 (2005), *opinion withdrawn and superseded on reh'g*, 361 N.C. 144, 638 S.E.2d 202, *and reversed in part based upon dissenting opinion*, 361 N.C. 144, 638 S.E.2d 202 (2006) ("*Jones II*"), together with *Jones I*, ("*Jones*"). The facts in *Jones* were as follows:

> [A]t approximately 9:00 a.m., Officer Tracy Fox ("Officer Fox") was dispatched to investigate a domestic disturbance[.] Soon after arriving at the scene, Officer Fox determined that she would need assistance and called for backup. Dispatch, upon receiving her call, issued a "signal 20" requiring all other officers give way for Officer Fox's complete access to the police radio by holding all calls. Officer Joseph M. Kelly ("Officer Kelly"[)] was approximately 2½ miles from [the disturbance], as were fellow Officers H.M. Crenshaw ("Officer Crenshaw") and R.D. Gaither ("Officer Gaither").
>
> In response to the first call by Officer Fox, Officers Kelly, Crenshaw, and Gaither got in their separate vehicles and began driving towards [the disturbance]. Officer Fox then made a second distress call, stating with a

voice noticeably shaken, that she needed more units.  Officers Kelly and Crenshaw activated their blue lights and sirens and increased the speed of their vehicles[.]  Officer Gaither took a different route.

At approximately 9:09 a.m. on the same morning, Linda Jones ("plaintiff") was leaving her sister's apartment complex at the southwest corner of the intersection of Liberty Street and Elizabeth Street ("the intersection").  The posted speed limit for motorists traveling upon Liberty Street was 35 miles per hour.  At the curb of Liberty Street, plaintiff observed no vehicles approaching, but heard sirens coming from an undeterminable direction.  A bystander outside the apartment complex also heard the sirens, but could not determine their direction.  Plaintiff, some 95 feet west of the intersection, began to cross Liberty Street outside of any designated cross walk and against the controlling traffic signal.  At this point in the road, Liberty Street had three undivided lanes: two eastbound lanes (the second or middle eastbound lane was for making northbound right turns only) and a westbound lane.  Reaching the double yellow lines dividing the two eastbound lanes which she crossed, plaintiff first saw a police vehicle heading towards her in the westbound [lane].  The vehicle came over the railroad tracks on the eastern side of the intersection.  Sergeant Willie Long, an eyewitness who was in his vehicle at the corner of Grace Drive and Liberty Street, and plaintiff both observed Officer Kelly's vehicle go completely airborne over the railroad tracks.  Once his vehicle crossed the railroad tracks, defendant saw plaintiff at a distance of between 300-332 feet and standing at the double-yellow lines.

Plaintiff turned and began running back in the direction from which she came, across the two eastbound lanes.  Officer Kelly, crossing

the intersection and accelerating, turned his vehicle with one hand into the eastbound lanes and struck plaintiff on her side as she was retreating to the curb. She was launched six feet into the air over the vehicle and landed in a gutter approximately 76 feet down along the eastbound lane of Liberty Street. Officer Kelly's vehicle traveled approximately 160 feet after striking plaintiff and came to a complete stop in the eastbound lane of Liberty Street. Plaintiff suffered severe injuries.

While Officer Kelly was en route to Officer Fox's two distress calls, he was aware at least four other officers were responding. . . . . [A]n accident reconstruction expert determined Officer Kelly's speed to have varied between 55 and 74 miles per hour.

*Jones I*, 168 N.C. App. at 434-35, 608 S.E.2d at 388-89. This Court held that, on these facts, the "plaintiff has not forecast sufficient evidence to show a genuine issue of material fact as to gross negligence on the part of Officer Kelly, [and that] defendants are entitled to judgment as a matter of law." *Jones I*, 168 N.C. App. at, 443, 608 S.E.2d at 393. The Court in *Jones I* reasoned:

In response to Officer Fox's two distress calls, Officer Kelly responded to apprehend the threatening suspect and defuse what he believed to be a life or death situation of a fellow Durham police officer. In pursuit of the situation, there was some dispute as to what speed Officer Kelly was alleged to have been traveling. In a light most favorable to plaintiff, this speed varied between 55 and 74 miles per hour on a road where the speed limit was 35 miles per hour.

*Jones I*, 168 N.C. App. at 441, 608 S.E.2d at 393. Our Supreme Court eventually reversed on this issue in *Jones II*, adopting the dissenting opinion in *Jones I*. *Jones II*, 361 N.C. at 146, 638 S.E.2d at 203. The dissent in *Jones I*, adopted by *Jones II*, reasoned:

> [T]he question is whether the evidence raises any genuine issue of material fact on the issue of gross negligence. Regarding gross negligence by a law enforcement officer, this Court has held:
>
>> An officer 'must conduct a balancing test, weighing the interests of justice in apprehending the fleeing suspect with the interests of the public in not being subjected to unreasonable risks of injury.' 'Gross negligence' occurs when an officer consciously or **recklessly disregards an unreasonably high probability of injury to the public despite the absence of significant countervailing law enforcement benefits**.
>
> Viewed, as it must be, in the light most favorable to the plaintiff, the record evidence would allow a jury to find that: (1) Kelly was not pursuing an escaping felon, but was responding to Officer Fox's call for assistance with a situation whose nature Kelly knew nothing about; (2) Kelly knew other officers had also responded to the call for backup, so that Officer Fox was not solely dependent on his aid; (3) Kelly was familiar with the street where the accident occurred, and knew it was a densely populated urban area; (4) as Kelly approached the accident site he was driving between 50 and 74 mph, and did not have his blue light and

> siren activated; (5) Kelly knew that the intersection of Liberty and Elizabeth Streets had been the site of several previous accidents, and that there were "people hanging out" there; (6) Kelly knew from previous experience that the safest maximum speed on the relevant stretch of Liberty Street was 45 mph; (7) Kelly did not apply his brakes when he saw plaintiff in his way; (8) Kelly lost control of his vehicle and struck plaintiff with such force that she suffered serious injuries; and (9) Kelly's failure to drive at a safe speed for road conditions was a violation of the Basic Law Enforcement Training manual. I conclude that this evidence, if believed by the jury, tended to show a "high probability of injury to the public despite the absence of significant countervailing law enforcement benefits," and thus raises a genuine issue of material fact on the question of gross negligence.

*Jones I*, 168 N.C. App. at 444, 608 S.E.2d at 394-95 (citations omitted).

Viewed in the light most favorable to Defendant, the record evidence in this case would allow a jury to find that: (1) Plaintiff was responding to a minor traffic accident involving only property damage, and the sole purpose of Plaintiff's response was to provide traffic flow assistance; (2) Plaintiff, against department policy, initiated emergency response driving without any justifiable reason, and without notifying his department; (3) Plaintiff engaged his blue lights at some point, but failed to engage his siren, which was also a violation of department policy; (4) Plaintiff sped along Highway 117 at speeds

topping one hundred mph where the posted speed limit was forty-five mph and possibly even thirty-five mph at certain points; (5) Plaintiff was a warrant officer and he did not usually engage in driving that required high speeds; (6) Plaintiff had no high-speed driving training beyond that obtained in his Basic Law Enforcement Training; (7) Plaintiff sped past a school, not knowing whether the school was in session; (8) Plaintiff also sped past an Interstate exit and a fire station before reaching Defendant's residential neighborhood; (9) Plaintiff, because of his high speed, either did not see Defendant before she pulled out to cross the north-bound lane and head south on Highway 117, or saw Defendant and did not take appropriate measures to avoid a collision; (10) if Plaintiff did not see Defendant, it was either because he was traveling around a blind curve, or because he was not paying proper attention to the road ahead of him, perhaps suffering from tunnel vision due to his excessive speed; (11) Plaintiff was traveling ninety-five mph and still accelerating until immediately before he made contact with Defendant's vehicle, when he finally removed his foot from the accelerator and apparently attempted to depress the brake; (12) this was the second automobile accident Plaintiff had been involved in in a single year; and (13) the accident would not have occurred had Plaintiff been engaged in "routine driving," which was all that

was warranted in this situation – in fact, the accident would probably not have occurred had Plaintiff simply been driving at a speed less than seventy-five miles per hour.

We find there was a "'high probability of injury to the public despite the absence of significant countervailing law enforcement benefits[.]'" *Id*. We hold these facts are, at a minimum, as persuasive as the facts in *Jones* and, therefore, as our Supreme Court did in *Jones II*, we reverse the trial court's grant of summary judgment in favor of Plaintiff and remand for further action on Defendant's counter-claims against Plaintiff.

### III.

Defendant also argues the trial court erred, to the extent, if any, that it based its award of summary judgment to Plaintiff, Western Surety, Farm Bureau, and United Services on the defense of governmental immunity. We agree.

It does not appear that the trial court granted summary judgment in favor of Plaintiff based upon governmental immunity. It is clear that the Wayne County Sheriff's Office had a $25,000.00 bond, issued by Western Surety, that was in effect at the time of the 30 December 2009 accident. "According to N.C. Gen. Stat. § 58-76-5, a sheriff waives governmental immunity by purchasing a bond as is required by N.C. Gen. Stat. § 162-8." *White v. Cochran*, __ N.C. App. __, __, 748 S.E.2d 334, 339

(2013). Therefore, summary judgment would have been improper on the basis of governmental immunity, at least as to potential damages up to the amount of the $25,000.00 bond issued by Western Surety. *Id.*

Furthermore, this Court has recognized actions brought pursuant to N.C. Gen. Stat. § 20-145 as falling outside the general rule of governmental immunity. *Young v. Woodall*, 119 N.C. App. 132, 139-40, 458 S.E.2d 225, 230 (1995) ("*Young I*"), *rev'd*, 343 N.C. 459, 471 S.E.2d 357 (1996) ("*Young II*"), (together with *Young I*, "*Young*"). In *Young*, a Winston-Salem police officer, Officer Woodall, was sued, wherein the

> plaintiff apparently argue[d] Officer Woodall failed to exercise reasonable care in the exercise of an alleged ministerial or proprietary function carried out for his own private purposes in contravention of departmental policy. Plaintiff also allege[d] that Officer Woodall failed to comply with the statutory standard of care codified in N.C. Gen. Stat. § 20-145.

*Young I*, 119 N.C. App. at 137, 458 S.E.2d at 228. The City of Winston-Salem had purchased liability insurance that would cover the alleged negligence of Officer Woodall, but only for any damages in excess of $2,000,000.00. *Id.* at 136, 458 S.E.2d at 228. This Court held:

> In summary, we conclude that the City of Winston-Salem and Officer Woodall, in his official capacity, are entitled to partial summary judgment based on governmental

> immunity for any damages up to and including two million dollars, except as to the contentions of negligence arising under N.C. Gen. Stat. § 20-145. We also conclude that Officer Woodall, in his individual capacity, is entitled to summary judgment, except as to the contentions of negligence arising under N.C. Gen. Stat. § 20-145. As to the contention that Officer Woodall failed to observe the standard of care provided in section 20-145, we affirm the trial court's denial of summary judgment on behalf of the City of Winston-Salem and Officer Woodall.

*Id*. at 139-40, 458 S.E.2d at 230. Stated another way, this Court held that governmental immunity did not apply to actions brought pursuant to N.C. Gen. Stat. § 20-145. Our Supreme Court granted discretionary review, and reversed in part, holding that the Court of Appeals had applied the wrong standard pursuant N.C. Gen. Stat. § 20-145, ordinary negligence, instead of the appropriate standard, gross negligence. *Young II*, 343 N.C. at 462, 471 S.E.2d at 359. Our Supreme Court reversed after applying the gross negligence standard and determining that the actions of Officer Woodall did not meet that standard. *Id*. at 463, 471 S.E.2d at 360.

Our Supreme Court did not overrule that part of the Court of Appeals' decision holding that governmental immunity did not apply to actions brought pursuant to N.C. Gen. Stat. § 20-145. In fact, though not specifically addressing this issue, our Supreme Court implicitly accepted this Court's holding that

governmental immunity does not apply to actions brought pursuant to N.C. Gen. Stat. § 20-145.  Bound by this precedent, we hold in the present case that Defendant's counterclaim based upon the alleged gross negligence of Plaintiff pursuant to N.C. Gen. Stat. § 20-145 is not barred by governmental immunity.

Reversed and remanded.

Judges HUNTER, Robert C. and ELMORE concur.